TATE'S ADMINISTRATOR, PLAINTIFF AND APPELLEE, vs. JONES' EXECUTOR, DEFENDANT AND APPELLANT.

In pursuance of a parol agreement for the sale and conveyance of lands, the purchaser paid the price agreed on in full; the purchaser was a tenant at will, in possession at the time of making the agreement, and afterwards remained in possession, erected a dwelling house and fences, enlarged the enclosures, cultivated the land, set out fruit trees

and pruned the trees already grown, and treated the property as his own, enjoying it as the home of his family, receiving the crops and the proceeds of the fruit for years, with the knowledge and without objection by the seller or his heirs or representatives: *Held*, upon bill filed for a specific execution of the agreement,

1. That upon a parol agreement for the sale of lands, the payment of the purchase price alone is not sufficient to take the case out of the statute of frauds.

2. That the payment of the purchase money, followed by delivery of possession, under a parol agreement for a sale of lands, or followed by a continued possession by the purchaser, (if already in possession,) and circumstances showing that the subsequent possession was inconsistent with the original tenancy, and was consistent only with, and legitimately referable to the agreement for a purchase and sale, constitute such part performance that the seller is estopped from insisting that the agreement was not signed, and a specific execution of the agreement may be decreed.

3. There is no rule that the improvements made by a purchaser under a parol agreement for the purchase of lands shall be of any specified value, in order to warrant the inference that they were made with reference to the contract. It is enough that they are of such a character, and made under such circumstances, that it will be inferred that they were made because of the agreement to convey.

Appeal from the Circuit Court for Jackson county.

This case was commenced in the Circuit Court for Calhoun county, prior to the adoption of the Code, and transferred, by consent, to Jackson county. Jeremiah Tate died pending the suit, and it was revived by his administrator, Seaborn Tate. The final decree was rendered subsequent to the adoption of the Code.

The other facts of the case are stated in the opinion of the court.

*C. C. Yonge* and *J. F. McClellan* for Appellant.

The complainant seeks a decree for specific performance of a parol contract for sale of a tract of land situated in Calhoun, which he alleges was made with R. S. Jones in his life time.

1st. The defendant denies, on information and belief, that any contract was made for the sale of the particular land sought to be specifically conveyed, alleging that the contract related to another and different tract of land.

2d. The defendant pleads the statute of frauds, claiming that if such contract was made that it was and is void because not reduced to writing as required by the 4th section of the statute of frauds, and also of the 1st section of act of Legislature of Florida, approved 15th of November, 1828. See Thompson, p. 217.

The complainant, admitting that the statute has not been complied with, seeks to bring the case within some exception to the said statute, and insists that though the contract was not in writing, that such part-performance has been made as will authorize the court to disregard the statute.

He claims—First, that the purchase-money was paid; second, that the purchaser entered into possession; third, that the purchaser had made valuable improvements on the land; fourth, that the contract was prevented from being reduced to writing by the fraud of the defendant.

A careful examination of the testimony and the law, as settled by the numerous adjudications, both English and American, will, we think, satisfy the court that neither of the positions occupied by the complainant, or all of them together, are sufficient to authorize the court to disregard the positive requirement of the statute, that contracts for the sale of land, or some note or memorandum thereof, should be in writing. The Florida statute, though not a literal copy of the statute of Charles, is, as far as the questions involved in this case are concerned, substantially the same. The language is: "No action shall be brought on any contract for the sale of lands, tenements, or hereditaments, or of any interest of or concerning the same, or for any lease thereof, for a longer term than one year, unless the agreement or promise, upon which such action shall be brought,

or some note or memorandum thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person thereunto lawfully authorized." Thompson, 217–18.

The cases in which the courts have dispensed with the requirements of the statute are where the refusal by the court to decree a specific performance would work a fraud upon the party seeking it. Brewer vs. Brewer & Logan, 19 Ala., 481.

Lord Reddesdale's rule is: "That to authorize a disregard of the statute, there must be such part-performance as will put the party seeking the specific performance into such a position as will operate as a fraud upon him, unless the agreement be performed." Frame vs. Dawson, 14 Ves., 387.

An example of this is where on a parol agreement a man is admitted into possession he is made a trespasser, unless his possession be referred to the agreement. Gregory vs. Mighill, 18 Ves., 333.

This doctrine is expressed by Hovenden, vol. 2d, p. 448, in this language: "When the agreement has been so far performed by one party, with the tacit encouragement of the other, and relying on his fulfilment of it, that for the latter to repudiate it and shelter himself under the provisions of the statute, would amount to a fraud upon the other, that fraud will be defeated by compelling him to carry out his agreement."

The ground on which the courts justify themselves in disregarding the statute, is the defeat of a positive fraud, and not to punish a breach of faith.

Browne on Frauds, p. 488, says the cases that have been relieved against "presented the feature of actual fraud, an artifice, a trick."

The plaintiff must show that his position is such that an action at law will not afford him adequate relief. Ib., 452.

See Frame vs. Dawson, 14 Ves., 386; Pembroke vs. Tharpe, 3 Swant., 437; Bookhurt vs. VonConottond, 1 John. Cas., 273; Armstrong vs. Kettlehorn, 11 Ohio, 265.

The courts do not profess to execute a parol contract merely because it is satisfactory proved. Beckmaster vs. Norris, 7 Ves., 341.

In the case of Frame vs. Dawson, the bill alleged that the complainant finding a party-wall required repairs, applied to his landlord for contribution, who made a verbal promise to extend the lease for ten years. On the faith of that promise, complainant expended £460 on the wall, the annual rent being only £35. The answer admitted the request for contribution, but denied any positive promise, and relied on the statute of frauds. The court said: "No matter how clearly the agreement be proved, the complainant is not entitled to a decree. He must show part-performance by acts unequivocally referable to the contract, such as the party would suffer an injury amounting to a fraud by refusal to execute the contract." Ib., 386.

The principle is, that the act must be such that, if stated, it would itself infer the existence of some agreement, and then the agreement may be proved. Ib., 587.

"The act must be unequivocal." Wills vs. Stradling, 3 Ves., 387.

Example in which a court of equity will disregard the requirement of the statute: where there was an agreement for a deed and for a defeasance, and after execution of deed the party refused to execute the defeasance, the court compelled the execution of the defeasance. Roberts on Frauds, p. 130.

"There is no foundation for the doctrine of part-performance, without the ingredient of actual fraud." Ib., 132.

Another example is where the remainderman encourages a party to take a long lease and make valuable improve-

ments, and the tenant for life dies before the expiration of the lease. Ib., 133.

"When a party neglects to avail himself of the protection of the law, choosing to rely on the honor of the party, he has little reason to complain." Roberts on Frauds, 133.

The courts have gone too far in permitting part-performance and other circumstances to take cases out of the statute. "Part-performance," Lord Avanley aptly says, "may be evidence of some agreement, but what agreement?" He says the courts ought to have required repayment. Ib. See cases of Holis vs. Whiting, 1 Vern., 151, and Dean vs. Bond, where large sums of money were expended on the faith of verbal contracts of lease, bills were sustained so far as to require repayment of the money. N. 66, p. 135, ib.

The courts do not execute the contract for the sake of the contract, but to disconcert the fraud. P. 135.

The court should reject all evidence of a verbal contract for sale of land, if being taken as true, it does not constitute an exception to the statute. (Poorman vs. Kilgore, 26 Pa., 365.) The doctrine of part-performance as ground of enforcing contracts has been repudiated in several States—we think in North Carolina, Mississippi, Tennessee, and perhaps others. See Ellis vs. Ellis, 1 Dev. Eq., 341; Beamen vs. Buck, 9 S. and M., 210; Redley vs. McNairy, 2 Humphreys, 174; Jacobs vs. Peterborough & Sherley R. R. Co., 8 Cush., 224.

The above citations of authorities are sufficient to show how careful the courts are in admitting exceptions to the statute of frauds, regretting, as most of the judges seem to do, that any exceptions at all have been permitted.

I. As to the effect of payment of purchase-money. See Bell vs. Andrews, 4 Dal., 152.

Payment of purchase-money alone is not sufficient part-

performance to take cases out of the statute of frauds. Cole vs. Watts, 2 Stock., 67.

Money paid on verbal contract for sale of land may be recovered back. Allen vs. Booker, 2 Stewart, 21; Keath vs. Patten, ib. 38.

Payment of purchase-money is not part-performance, for it may be recovered back with interest. 2 Hovenden, p. 3.

"Payment of the money is not part-performance—it may be repaid and party restored to his former situation." 14 Ves., 388.

II. As to the character of improvements that will operate to suspend the operation of the statute.

They must be of such character "as to appear to have been made in pursuance of the contract." (Browne, 454.) They must be such as appear to the court would not have been made except on account of the agreement. Lacon vs. Mertin, 3 Atk., 34; Frame vs. Dawson, 14 Ves., 586.

The improvements must be with the knowledge of the other party, and when he, with such knowledge, remains silent, it imports a fraud. See Roberts, 130.

"Improvements to be of weight, in case of a continuing possession, must be decidedly inconsistent with the old relation." Spalding vs. Conzleman, 30 Mo., 177, 1st p., 209.

III. As to effect of possession by the purchaser.

"The possession of vendee is not sufficient when not shown to be under the contract of sale." Danforth vs. Loney, 28 Ala., 274.

When the possession is alleged in the answer not to be under the contract of sale, the burden is on the complainant to show that it was. Ib., 274.

"With respect to a tenant already in, remaining in possession, amounts to nothing." 2 Hovenden, p. 3.

"The possession must be connected with the contract of

sale, and in part-performance of it, and be intended to be in pursuance of it." NcNeil vs. Jones, 22 Ark., 277; Danforth vs. Lacey, 23 Ala., 274; Charpiot vs. Sigerson, 25 Mo., 63; Cole vs. Potts, 2 Stock., 67; Knoll vs. Harvey, 19 Wis., 99.

"Continuance in possession cannot be deemed part-performance. The possession must unequivocally refer to and result from the agreement." McHanna vs. Blunt, 20 Iowa, 142; Resenthal vs. Freeburger, 25 Md., 75.

"Possession that has been abandoned will not authorize decree." Chambless vs. Smith, 30 Ala., 366.

"A greater latitude will be allowed to the defendant in resisting than to the complainant in making out his case." Casey vs. Holmes, 10 Ala., 776.

IV. As to character of proof required:

"It must be competent, satisfactory, definite and certain." Lodell vs. Lodell, 36 N. Y., 327; Sims vs. McEwin, 27 Ala., 184; Carver vs. Losseter, 36 Ill., 182.

"The contract must be distinctly and clearly understood." Sage vs. McGuin, 4 Watts and Seg., 228.

"He who would recover land on evidence of a parol contract will be held to full, complete, satisfactory, and indubitable proof of what the contract was, and what land was purchased, the consideration that was paid for it, and that possession was delivered in pursuance of the contract." Woods vs. Farmore, 10 Watts, 195.

"The contract must be established by competent proof, and be clear, definite and unequivocal." Charnley vs. Honsberg, 13 Pa., 16; Prentiss vs. Mitchell, 17 Ga., 588; Wilson vs. Wilson, 6 Mich., 9; Aday vs. Eckols, 18 Ala., 353.

If the contract is impeached by competent proof, it must be sustained by rebutting proof or the bill will be dismissed. Meid vs. Randolph, 8 Texas, 191.

The general facts relied on as showing part-performance

must be specifically set forth in the bill, and evidence not applicable to the special allegation will not be heard. Bonier vs. Caldwell, 8 Mich., 463.

These authorities seem to establish the following propositions:

1. That the courts are reluctant to allow exceptions to the statute, and refuse to extend the doctrine beyond the original precedents.

2. That payment of the purchase-money is not such part-performance as will take a case out of the statute, because the money may be paid back or recovered in an action at law.

3. That a continuing possession is not part-performance, and in the language of one of the cases cited, "amounts to nothing."

4. Possession that has been abandoned amounts to nothing.

·5. That there is a well recognized distinction between a mere breach of faith in completing a parol contract for sale of land, and such fraudulent conduct as will dispense with the requirements of the statute, every refusal to complete a verbal contract involving, as it does, a breach of faith.

6. Nothing is part-performance which does not put the party seeking specific performance into a situation which is a fraud upon him, unless the agreement be performed.

7. The proof of the contract itself must be complete, satisfactory, clear, definite and certain.

8. That a stronger case is required on the part of the complainant to entitle him to a decree than on the part of the defendant to resist a decree.

### Remarks on the Evidence.

An examination of the numerous depositions will show great conflict between the witnesses. The complainant's witnesses are not only contradicted on most points by the

witnesses of defendant, but are not consistent with each other.

Mrs. Shaw, for complainant, says she was present at the trade, and that the purchase-money was paid at the time; could not locate the grove which was sold.

Register, for complainant, says Mrs. Shaw was present on the day of the trade, but does not think she was present at the time of the trade; and says the money was not paid on the day of the trade, but at a subsequent time.

Redd says she was not there; Whitfield says she was not there. The explanation probably is that she was alluding to the trade for the other grove, about which there is no controversy.

Samuel Davis, for complainant, proves that Tate's possession antedated the alleged purchase.

Defendant objects to so much of the witnesses's testimony as states the declarations of Tate. Witnesses's answer to the eleventh interrogatory, taken in connection with his other answers, shows that his information was, to a great extent, obtained from conversations with Tate. He says Tate commenced improving the place as soon as he bought it, and yet it is evident he did not know when he bought it, for he went to buy it himself for a Mr. Bryant, and found it already sold. He gives it as his opinion that the improvements made by Tate were valuable, which is not admissible. It is for the court to determine whether they were valuable. Says he set some orange trees, but don't know how many, and pruned others; bought 500 feet of lumber, whether before or after the alleged purchase does not appear; built a common log-house, which Mary Lee, in answer to the sixth cross-interrogatory, says was a smoke-house; made some cow-pens enclosing about five acres. His object in asking permission to occupy the place was to use it as a stock place for his cattle, and these improvements were necessary for these purposes. The cost of them is not given, and if the court

will act on its own information as to the cost of such improvements, we are sure they will not say they were beyond the value of the privilege of occupying the place rent free. All this is certainly consistent with his tenancy. He had agreed to take care of the place, (see Mary Lee's deposition,) and as the orange trees give it its value, he could do no less than give the grove such attention in the way of re-setting the trees, when they were too thick, and pruning such as required it.

Says he thinks Tate planted 50 trees. What he thinks about it is not testimony, and is contradicted by the other witnesses.

Mary Lee's deposition seems to be generally based upon information derived from Tate, and is objected to on this ground. She says Tate made cow-pens; enclosed five or six acres. She thinks he set out 75 trees, and manured them; the charge was a dollar a tree to manure them, and that it would take three hands a week to set them out; that she helped to set them out, and that they grew on the place.

The extravagance of this statement as to cost of manuring trees and labor required in setting them, is enough, without contradiction, but she is contradicted by complainant's witness, Seaborn Tate, who says in answer to sixth cross-interrogatory that he set out the trees, and that two days was time enough to do it in.

Seaborn Tate's testimony, though for the complainant, is most valuable for the defendant. He occupied a position, being a member of complainant's family, to speak of his own knowledge, and his bias, if any, would naturally be for, and not against the complainant.

It is true, that he says the improvements made by complainant were valuable, but his opinion is not evidence, and the details he gives of what constituted the improvements (and which are not proved to have been made after the alleged purchase,) show that they were entirely consist-

ent with his tenancy. They consisted in clearing up the grove, making some fences and planting some trees.

He says, in answer to the cross-interrogatories, that Jones, the defendant, put Tate in possession of the place "to take care of it." That there were seventy-five trees in the grove, and about a dozen more were taken from the grove on the place and planted, that is, they were simply re-set; that it would take one hand two days to plant them, which, at a charge of one dollar per day, would be two dollars as the cost of the planting; he also says he was the person who planted them. The other witnesses show that some cow-pens were made for his stock, and a small patch enclosed, we may suppose for potatoes and greens, such as you find at every piney woods place. In "taking care of the place," which constituted the only consideration for its occupancy, he could not do less than the small amount of work testified to on the orange grove in clearing it up and re-setting a few trees. The other improvements were for his own convenience, and were of small value. The defendant's witnesses, however, prove that these enclosures were already on the place when complainant went there. Whitfield testifies as to the sale of another grove and knows nothing about the sale of the grove in controversy. He states that Tate occupied the grove in controversy as the tenant of defendant, to take care of the place, and that the improvements made by him were of very little value, not more than the value of the rent. That there were about 50 or 60 trees in the grove when Tate took charge of the place, and that he re-set about one dozen more; that one man could do it in a day, and was worth about seventy-five cents. This corroborates and sustains Seaborn Tate's testimony.

Mr. Redd also proves that Tate occupied the grove as tenant of Jones, and states that no improvements of value

were made by him, and the few trees that were re-set were taken from the grove on the place.

Sarah Yon shows acts of ownership by Jones over the grove after the alleged sale, refusing to sell it, stating it would be a resource for his family after his death.

Rolly Richard's testimony is objected to so far as it is hearsay, and amounts to but little.

Rhames and Redd both testify to the abandonment of the grove west of Chipola, by Tate, the alleged purchaser of it. Rhames says Tate injured the grove by trimming it too high.

Page testifies that the grove was in a better state of improvement and condition when Tate went into posssession, than in 1866. That there was on the place a dwelling house, smoke house, corn crib and horse lot, six or seven acres enclosed and in cultivation, and only two or three more orange trees than when Tate went there.

Whitfield, on re-examination, states about the same thing. Willis says Tate built no house on the place; that the place was in a bad condition when Tate went there, and not much better when he left.

Hawkins says the place was in bad condition in 1866, compared to its condition when Tate went there.

We think these depositions establish the following propositions:

1. That the improvements made by complainants are not of such a valuable character as will be held to be part-performance of a verbal contract for sale of land and will not dispense with the requirements of the statute, and that they were consistent with the terms and object of his tenancy, and were not necessarily referable to his alleged purchase.

2. That there is no evidence that the defendant Jones encouraged the small improvements that were made by complainant, or that he was even cognizant that they were being

made, and that there is an entire absence of proof of any fraudulent acts or devices by the defendant.

3. That the possession of Tate was a continuing possession, he having acquired it, before the alleged contract of purchase, to use as a place for keeping and penning his stock of cattle, and with the understanding that he was to take care of the place, paying no rent.

4. That after the alleged contract of purchase he abandoned the possession of the place.

5. That both parties could write, and that the proposition that the alleged contract was prevented from being reduced to writing by the fraud of the defendant is entirely unsupported by proof.

In Purcel vs. Minor, (4 Wal., 513,) the Supreme Court says: ·It is necessary in order to enforce a parol contract for the sale of land—

1. That the proof should be "full, satisfactory and indubitable."

2 That there must be left no *jus deliberandi* or *locus pœnitentiœ*.

3. That it must not be made out by hearsay or declaration of a party to strangers.

4. That payment of the purchase-money is not sufficient if the party have a remedy at law to recover it back.

5. That there must be such part-performance that its recission would be a fraud on the other party, and could not be fully compensated in damages in a court of law.

6. That the delivery of possession has been made in pursuance of the contract and acquiesced in by the other party, which is not the case where the proof shows a scrambling and litigious possession.

Here the possession was not continuously in the complainant, but was first in defendant, then in complainant as lessee, then for some time in the defendant, then in a receiver, and was scrambling and litigious.

1. In this case the proof is not full, satisfactory and indubitable, but is uncertain, vague and conflicting.

2. The *jus deliberandi* or *locus pœnitentiœ* survived the payment of the purchase-money because it could be repaid or recovered back, as both parties are presumed to have known when it was paid, if it was paid.

3. The proof offered by the complainant is nearly all of the description condemned by the Supreme Court, such as hearsay and declarations to third persons.

4. That the complainant undoubtedly had the right and ability to recover the purchase-money, if paid, by action at law.

5. There is no part-performance that could not be compensated in damages in a court of law, whether it be the recovery of the purchase-money or the value of the improvements. But we insist that there were no improvements that were necessarily referable to the alleged purchase, and that such as were made were not inconsistent with the complainant's tenancy. The truth is, that at the time of this transaction, orange groves had not become of the value they now are, and were not regarded so either by the complainant or the defendant, and the accidental increase in value of the improvements cannot change the rights of the parties.

We conclude with the suggestion that the wisdom of the statute of frauds and perjuries, in its purpose to remove temptation to perjury, by refusing to permit contracts for the sale of land to be established by oral testimony, finds no fitter illustration than in this case. Some fifteen or twenty witnesses have been examined, and the conflict between them is from the beginning to the end. A rigid adherence to the requirements of the statute, by excluding these depositions and simply requiring the contract to be in writing, as the statute provides, would have saved all this conflict, and have been the wiser course. And as is said by Roberts, on page 133, "when a party neglects to avail himself of the

protection of the law, choosing to rely on the honor of the party, he seems to have little right to complain."

We think the Supreme Court of Florida has not before been called upon to determine the questions involved in this case, and it is free to follow the example that has been set by several States in adhering to the requirements of the statute. It is the province of the Legislature to determine what shall be the law of a State, and the duty of the courts to expound the law as written, and not to find plausible excuses for setting aside and disregarding the will of the Legislature. The law is, that no action shall be maintained on such a contract as it is alleged was made between the complainant and the defendant in this case, and the courts will have discharged their whole duty when they yield obedience to this requirement of the statute; and should the court, in its wisdom, adopt this course, it will hereafter be saved the regrets in which we so often find other courts indulging, by permitting any exception to the full operation of the statute.

*George S. Hawkins* for Appellee.

I contend that the contract of sale, as alleged in the bill, has been fully performed ; and a court of equity will enforce a parol agreement when there has been part-performance. 2 Story Eq. Ju., 759–761.

The price of the land was paid by Tate, possession taken and retained till a wrongful and covenous entry by the defendants in the court below. Extensive and valuable improvements were made by Tate, and the land purchased has been duly identified as the property sold by Jones to Tate.

*Payment of the Consideration Money.*—Although payment alone is not sufficient to satisfy the statute of frauds, yet it may corroborate other acts which are regarded as part-performance so as to afford ground for a decree of spe-

cific execution.   If accompanied by the act of entering into possession in pursuance of a verbal contract of sale, a case of part-performance is established.   Browne on the Statute of Frauds, 465, and authorities cited.

For proof of sale and payment of purchase-money, see answer of Mary Jones, Adaline Shaw, Duncan Shaw, Samuel Davis, John Jones, Mary Lee, R. J. Taylor, and James Register.

*Possession.*—The evidence shows that Tate was in possession of the grove a short time before the sale; that he was placed in that possession by R. Lawson Whitfield with leave to stay there till he (Tate) could build a house, and he was to take care of the place.

A temporary possession was given to Tate.   No lease is shown, nothing beyond a mere license, revokable at any moment, and which expired with the death of Jones in December, 1863, the sale having been on the 10th June, 1863. *Vide* Hilliard on Vend., p. 125, 129, 132; Browne on Frauds.   See Whitfield's testimony.

 · Admitting a temporary possession, yet we say it was continued after the sale, and such acts were performed by Tate as to show that this possession was held and continued by him, not under the license, or at most a tenancy at will, but in pursuance of and solely referable to the contract of sale.   In cases like the present, the great and vital question is the *quo animo*, the possession was taken and held by Tate.   Browne on Statute Frauds, 476, 478, 479; Wills vs. Stradling, 3 Vesey, 378; 1 Sug., V. & P., 163.

A continuous possession is enough, if in ·pursuance and execution of the contract.   2 Parsons on Con., 550, 551, 552, 553, and authorities citied, especially Mundy vs. Joliff, 3 My. & Cr., 177; Adams Eq., (86) top p., 230; Hilliard on V., 148; 1 White & T. L. C. Eq., 726, 3d ed., citing and commenting on Lester vs. Foxcraft, a leading case; possession is sufficient where the assent of the vendor

is shown or inferrible. Smith vs. Underdonk, 1 Sand., 379; Hart vs. Hart, 3 Des., 592; Anderson vs. Chick, 1 Bailey, 118.

Possession alone, in pursuance of a contract, without any pretence of improvements, is sufficient. Parsons' Selected Cases in Eq., 427–429; Browne on Statute Frauds, §466–467.

Possession was retained by Tate under the contract of sale for several years, and until defendant, R. L. Whitfield, covertly and tortiously deprived him of it.

As to continued possession, I. cite further: Browne on Statute Frauds, §484–485; Wilde vs. Fox, 1 Rand., 165; Thompson vs. Scott, 1 McCord, ch. 32; 1 Hilliard on V., 148, citing, in note 4 Drury vs. Conner, 6 Harris & John., 288; Sugden on V. (141) 163, citing with approbation Wills vs. Stradling, 3 Ves., 378.

Where tenant, continuing in possession, makes improvements upon the premises, it is of great weight to show a change in the holding. Browne Statute Frauds, §480, citing Savage vs. Carrole, 1 B. & B., 119; Sutherland vs. Briggs, 1 Hare, ch. R., 27–31; Donald vs. Drew, 1 Young & Col., 345, (356.) In the first case, Morphet vs. Jones, 1 Swanston, (a leading case) was quoted by Sir James Wigram, V. C., who, in deciding the cause, materially qualified the strict doctrine in that case as to continuing possession and part-performance, and he adopted the decision of Mundy vs. Joliff, 3 Mylyne & Cr., already cited. In the latter case, ( 1 Y. & C.) the case of Morphet vs. Jones was cited to show that a purchase and a continued possession by a tenant did not constitute part-performance. But Sir J. L. Knight Bruce, who decided the cause, also qualified the old arbitrary rule as to the continued possession by the tenant. Both of these cases are *quatuor pedibus* with the case at bar. In the case of Mundy vs. Joliff, cited in 2 Parsons on Con., 554, Lord Cottenham, Lord High Chancellor, held

that even where the agreement was not made out with perfect precision, yet if the plaintiff had laid out money, or otherwise makes out a case of part-performance, the court will endeavor, with especial earnestness, to collect, if it can, what the terms of the agreement were. Browne on Statute Frauds, §§481, 484, 486, 487.

1 Story Eq. Ju., 11th ed., §763, a., citing a very recent decision upon this interesting question.

*Improvements.*—Extensive and valuable improvements were made by Tate upon the land in controversy, and money expended. 1 White & T. L. C. in Eq., (3d Am. ed.) 732–733, and authorities cited; Browne on Statute Frauds, §488–487. In Malinis vs. Brown, 4 Comstock, N. Y., 403, cited in Kent Com., the court held that the mere payment of money was enough to take the case out of the statute, if the repayment of the money would not restore the plaintiff to his former position.

*Locality and Description of the Property Sold.*—The evidence clearly shows that the orange grove west of the Chipola river, and described as the south half of lot 5, section 30, township 4, range 9, in the county of Calhoun, was the one sold by Jones to Tate. The very fact of the continuing possession of Tate, which has been so zealously attempted to be ousted to our disadvantage, carries with it an inherent evidence that the above-described property embraced the orange grove west of the river and the one purchased by Tate from Jones. All the circumstances are to be taken together, and moral probabilities; moral evidence are sufficient. 1, Hovenden Frauds, 21; East India Co. vs. Donald, 9 Vesey, 282.

As to the boundaries and description of land sold, I cite 1 White & T. L. C. Eq., 724–741, 2 Parsons on Con. There is a sufficient description of a contract, if the court can ascertain its terms with reasonable certainty from the whole evidence. Rhodes vs. Rhodes, 3 Sand., 279–281;

Parkhurst vs. Van Cortlandt, 14 John., 13–37; Burns vs. Sutherland, 7 Barr., 103–106.

*Acts of the Parties.*—The acts of the parties can be taken as *indicia* of the true terms and meaning of the contract, and the intention when ascertained will be carried out. Broome L. M., 221. *Acta exteriorari indicant secreta.* The court will inquire as to the situation of the parties, their intentions and the object of the contract. 1 Story Eq. Ju., § 168; French vs. Cahart, 1 Comstock, 102, and authorities cited; 8 Howard U. S., 274; 13 Peters U. S., 89, 98, 99; Story Eq., §793.

What were the acts here? The contract is made; money paid. Tate continues his possession immediately after sale; he clears up the grove, prunes the trees, builds fences, sets out trees, takes the fruit and sells it from 1863, (the year the grove was sold,) for several years, and until he was ousted from the possession by R. L. Whitfield. There is no evidence of demurrer, no protest of Jones during his life, or of his representatives after his death.

Jones stood by for several months, from 10th of June, 1863, to December, 1863, and up to the time of his death, and saw the improvements made by Tate. There is not the least evidence showing that Jones interfered with the possession of Tate, or that he interposed any claim of title; and so with the heirs or representatives of Jones. See Story Eq. Ju., §§788, 793. That possession was open, public, notorious, as were the improvements of Tate. In fine, there was silence, acquiescence. *Qui tacet consentire videtur.* Silence implies consent, and such consent may be implied from the party's subsequent conduct. Broome L. M., 620. The doctrine of estoppel applies with full force to Jones during his life, and those claiming in privity with him in estate after his death. *Vide* Camp vs. Moseley, 2 Fla., —; Ponder vs. Moseley, ib., 207; Hollinsworth vs. Hancock, 7 Fla., 338.

If one man knowingly, (says Chancellor Kent,) though he

does it passively, by looking on, suffers another to purchase and expend money on land, under an erroneous opinion of title, without making known his claim, he shall not afterwards be permitted to exercise his legal right against such person. It would be an act of fraud and injustice, and his conscience is bound by the equitable estoppel. Wendell vs. VanRensalaer, 1 John. Ch., 353.

Specific performance will be decreed when party cannot be placed in *statu quo*. 2 Story Eq. Ju., §§761, 774; 1 Hilliard on Vendors, 417; Broome on Stat. Fraud, §463.

But suppose estate insolvent, as it probably is. Story Eq. Ju., 760. Unless specific execution of the contract of sale is decreed, Tate would be regarded as a trespasser, and be liable to account for all the profits of the orange grove for a series of years, until it was wrested from his possession by the fraud and covenous entry of one of the defendants and the appointment of a receiver. A fraud would be practiced upon Tate if performance refused. Relief in these cases is administered on the ground of fraud. The statute was not intended as a guard and protection to fraud, but as a security against it. 2 Parsons on Con., 553–4; 1 Mad. Ch., 377–8; 1 Story Eq., §761; 1 Sug. V., 141; 4 Kent, 451.

Where agreement was intended, or promised to be put in writing, but it was prevented by fraud of one of the parties, equity will enforce the contract. 2 Story Eq., §768; Jenkins vs. Eldridge, 3 Story R., 181. So where death of one of the parties. 1 White and T. L. C., 740. So where fully performed on both sides. 13 Pick., 1; Scott vs. Newsome, 27 Georgia, 204.

*Consideration.*—It was adequate and valuable at the time of the contract. Even if inadequate, the court, in case there is no fraud, undue influence, and the like, will decree specific performance. Story Eq. Ju., §§244–45–46; 1 L. C. Eq., 590. Inadequacy of price must amount in itself to

decisive and conclusive evidence of fraud. Adams Eq., 78, note 79; Rogers vs. Surget, 19 Howard U. S., 303.

It cannot be contended that there was any fraud or undue influence practiced upon Jones. The court will not create a contract for the parties. The question of adequacy or inadequacy of price must depend upon and have relation to the value of the property on the 10th of June, 1863, the day of the contract of sale. The court can judicially know that at this period there was war, and of course, with its usual incidents and concomitants, pecuniary distress and embarrassment, and the depression of property in point of value to its lowest ebb. The value of the grove and its productions after the war is not to be taken into consideration, for its termination indubitably created a powerful reactionary influence upon the value of property generally, and orange groves especially, which assumed high speculative and even fictitious values. R. Lawson Whitfield himself says that the grove, when Tate took possession of it, was worth only $800, and $200 on the 28th of May, 1868. Stephen Page, a witness for defendant, says that when Tate bought it it was worth $300. Whitfield said that the oranges were sold at five and six cents each. Rhames and Thomas, witnessess for defendant, say they were worth three or four cents apiece. Whitfield says "that I value them (the oranges) in greenbacks, as I saw them bring it;" he is speaking of the sale of the oranges in 1863, 1864, 1865 and 1866. Were there greenbacks in Florida during the two first years?

In concluding my argument, I again respectfully refer to the position already taken, that possession alone, in pursuance of a contract, without any pretense of improvements, is sufficient to sustain a decree for specific execution. Parsons Selected Cases in Eq., 428–29; and that possession alone, without payment or other acts of ownership, is sufficient part-performance of a verbal contract for land to sus-

tain a decree for its specific execution.   Browne Stat. Frauds,. §467, and the large number of authorities in note 3.

Evidence as to improvements having been made upon· land agreed to be sold under a verbal agreement, is certainly necessary where it is sought to rescind the contract; but in cases of pure specific performance they are regarded as· establishing the *quo animo* the possession was taken, crea-- ting an *a fortiori* case of part-performance, and as " con- firmatory of the rights of the plaintiff in seeking a specific· execution of a verbal contract for a sale in land."   Browne· on Stat. Frauds, §487, and authorities cited, §478, ib.

THE CHIEF-JUSTICE delivered the opinion of the court.

This suit was commenced in 1866 by Jeremiah Tate in his life time against the executor and  heirs at law of Rob- ert S. Jones, for the purpose of enforcing the specific per-· formance of an agreement, not in writing, for the convey- ance of lands in Calhoun county alleged to have been made in June, 1863, between Robert S. Jones and Jeremiah Tate.

The bill alleges that Jones and Tate entered into an. agreement, whereby Jones agreed to sell and convey to· Tate the lands described for the sum of five hundred dol- lars, on which land was an orange grove situated on the west bank of the Chipola river, and that Tate paid to Jones the purchase-money in full, to wit: five hundred  dollars ;. that Jones agreed to execute the necessary deed of convey- ance, and have the same recorded in the clerk's office in a few days thereafter, he being then sick; that Jones put Tate in possession of the land, which possession he has con- tinued to hold to the time of filing the bill, believing  that Jones had performed his  promises, and that he had, during his occupancy, made numerous and valuable improvements upon the property.   Jones died in December, 1863, having. failed to execute the deed.

Tate v. Jones—Opinion of Court.

The defendants answer that they know nothing of the alleged bargain and sale or the payment of the money, and allege that Tate was in possession of the land as the tenant, or by the permission of Jones, at and before the time of the alleged agreement; and they insist on the provisions of the statute commonly known as the statute of frauds as a bar to the right of action for a specific performance of the alleged agreement.

After taking testimony, the case was submitted to the court, and a decree was made upon the facts as found by the court directing the defendant to convey the premises as prayed in the bill of complaint. From this decree the defendant appealed.

The only questions presented in the argument are upon the effect of the statute of frauds, and the sufficiency of the proof to take the case out of the operation of the statute.

The statute is as follows: "No action shall be brought whereby  *  *  charge any person upon any agreement made upon consideration of marriage, or upon any contract for the sale of lands,  *  *  unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person by him thereunto lawfully authorized." Thomp. Dig., 217–218, act of November 15, 1828.

"The whole class of cases," says Story on Eq. Jurisprudence, §741, "of specific performance of contracts respecting real estate, where the contract is by parol, and there has been part-performance, or where the terms of the contract have not been strictly complied with, and yet equity relieves the party, are proofs that the right to maintain a suit in equity to compel a specific performance, does not and cannot properly be said to depend upon the party's having a right to maintain a suit at law for damages." 2 Sch. &

Lef., 347–8, 684; 13 Ves., 228; 1 Sugden, Vend., c. 4, sec. 2, 246–7, 9th ed.

" If an agreement be by parol, and not signed by the parties, or some one lawfully authorized by them, if such agreement be not confessed, as is said, in the answer, it cannot be carried into execution ; but if it be carried into execution by one of the parties, and such execution be accepted by the other, he who accepts it must perform his part. As if A. sells his estate to B. by parol for one thousand pounds, if A. accepts the one thousand pounds, or any considerable part of it, he must convey his estate to B., for otherwise it is a fraud to accept the money of B. and not convey it. And it could never be the intent of the statute (which was to hinder bargains from being sworn upon men that they never made) that men should take advantage of not completing bargains which they had made, and which were actually performed to them ; for when there is a performance the evidence of the bargain does not merely lie upon the words, but upon the fact performed, of which they have reaped the advantage ; and it is perfectly unconscionable that the party who has received the advantage of the verbal contract should be admitted to say such contract was never made ; for the law must be construed according to natural equity, and not to create a fraud ; and the person that receives money and does not convey is plainly guilty of a fraud, and therefore must not be permitted to insist that he did not sign, when he has received all the benefit he could have had by such signing, for that were to construe the statute against frauds so as to protect fraud and not suppress it." Lord Chief Baron Gilbert, Lex Prætoria, C. I., 232–233, citing Leake vs. Maurice, Eq. Abr. 23, p. 20, 2 Ch. Cas., 135.

The cases cited by Baron Gilbert contain the earliest interpretation of the statute of 29 Car. II., of which the stat-

ute of Florida is a substantial copy.   See also 1 Story's Eq. Jur., §759, and authorities cited.

Sir William Grant, in Frame vs. Dawson, 14 Ves., 386, says: "It is admitted that supposing an agreement ever so clearly proved, yet, as a parol agreement, the plaintiff is not entitled to have it executed.   It is necessary, therefore, to show a part-performance ; that is, an act unequivocally referring to and resulting from the agreement, and such that the party would suffer an injury, amounting to fraud, by the refusal to execute that agreement."

And Browne on the Statute of Frauds deduces from a large number of American authorities, in section 465, the following: "Although payment alone is not sufficient, yet it may serve to corroborate other acts which are generally regarded as amounting to part-performance, so as to afford ground for a decree of specific execution.   Where, for instance, it is accompanied by a purchaser's entering into possession of land in pursuance of a verbal contract for the purchase of it, a case of part-performance is quite uniformly considered to be shown."

In Mississippi, and one or two other States, the courts have construed the statute so strictly as to refuse to enforce the specific execution of parol contracts for the sale of lands, even where there has been entire performance on the part of the purchaser by payment. and taking possession under the agreement.

The question comes before the court in this State for the first time in the present case: If we were to confine ourselves to the strict letter of the statute, and say that no power resides in the courts of equity to decree a conveyance of land in pursuance of a parol agreement to convey, notwithstanding the fact that the seller had received the full price agreed on, and had also in pursuance thereof put the purchaser in possession, or induced him to improve it, or fix his residence upon it, we should go far towards ab-

dicating one of the most important functions of chancery jurisdiction; a step which, after the beneficent action of the courts in England and in this country, and in view of the principles upon which they have acted, we cannot take.

In our judgment the statute should be construed so as to give it the full force and effect intended, and nothing beyond that. A *mere* parol agreement to sell lands cannot be enforced at law or in equity, but when one has agreed to sell, and has taken his price and delivered possession, he is estopped in equity from setting up the fact that he has obtained his neighbor's money and induced him to change his situation upon an agreement which he insists may not be enforced against himself, but the full benefit of which agreement he enjoys as fully as though he had executed it, for the evidence of the agreement no longer rest upon mere words, but "upon the fact performed of which he has reaped the advantage," and he "cannot be permitted to say such contract was never made," nor that he shall not complete what he had commenced to another's injury.

Formerly it was held that payment of the purchase-money alone was such part-performance that a specific execution would be decreed, but it seems that this fact alone is not now held to be sufficient, for the payment of money is not necessarily referable to a contract for the sale of lands. "The principle of the case is, that the act must be of such a nature that, if stated, it would of itself infer the existence of some agreement, and then parol evidence is admitted." Frame vs. Dawson, 14 Ves., 386.

But beyond announcing the rule which we hold should prevail in this State, where the common law of England has been enacted by express statute, and where the general principles of equity jurisprudence, derived from that country, have been recognized, it is not deemed necessary to go, nor to attempt an elaborate examination of the cases adjudicated. We adopt a rule elsewhere established. In a recent

case, (Purcell vs. Miner, 4 Wallace, 513,) the Supreme Court of the U. S. says that when a party seeks a court of equity to save himself from the consequences of his own disregard of the law in purchasing lands, "he should be held to full, satisfactory, and indubitable proof:

"*First.* Of the contract and its terms. Such proof must be clear, definite, and conclusive, and must show a contract, leaving no *jus deliberandi* or *locus pœnitentiœ.*

"*Second.* That the consideration has been paid or tendered. But payment of the price, in whole or in part, will not of itself be sufficient for the interference of a court of equity, the party having a sufficient remedy at law to recover back the money.

"*Third.* Such a part-performance of the contract that its rescission would be a fraud upon the other party, and could not be fully compensated by recovery of damages in a court of law.

"*Fourth.* That delivery of possession has been made in pursuance of the contract, and acquiesced in by the other party."

In that case one Coleman had agreed with Purcell to exchange a house in Washington for a farm in Virginia. The value and terms were agreed on, and Coleman delivered the key of the house to Purcell, and he, Purcell, was to prepare the necessary deeds to be executed by both parties. Purcell prepared the deeds, executed his own, and tendered it to Coleman, requesting him to execute the deed on his part; but Coleman refused, and conveyed the house to Miner. Purcell never had the undisputed possession of the house, although he had received the key. He then, upon these facts, filed his bill for specific performance.

The court remarks, that "if either party had delivered the deed in execution of the trade or bargain, and the other had refused to fulfill his part, by making a proper conveyance, or if valuable improvements had been made by the

party in possession, (under the agreement,) there would have been a case for a decree of specific execution." But because the price was not paid, nor the deed delivered, and no actual possession had been delivered of the house itself, Coleman had taken advantage of the *locus pœnitentiœ* and refused to receive the price, to deliver possession, and to execute his deed, and the court refused the decree. It will be observed that neither of the parties in that case had parted with anything of value, and no actual possession had been given, and no action would lie by either party.

The case of Purcell vs. Miner is cited by the appellants here, and we believe contains the rules upon which this case should be determined.

In examining the voluminous testimony it will be unnecessary to give here more than the substance of it, and the conclusions which result from it.

First, then, as to the proof of the agreement. The witness, Adaline Shaw, states that she was present when a bargain was made between the parties in June, 1863, for the sale by Jones to Tate of the orange grove in question, situated on the west side of the Chipola river or Dead Lakes; that the price was $500; saw the money paid; Jones said there is $500 for the orange grove; Jones wanted to sell Tate also some lumber on the place, and Tate declined to buy it; Tate was then living on the place; Jones said he would make a title " as soon as Clark came over."

Mary Jones, the widow of Robert S. Jones, says in her answer, that some time before Jones' death, at Jones' house, she heard Tate and Jones speak of a *contemplated purchase of the place*, but saw no money pass or any writing, and heard no contract of sale.

Duncan Shaw says that in 1863 Jones told him he had sold the orange grove on the west side of the river to Jeremiah Tate for $500. Samuel W. Davis says that in 1863 he went to Jones to buy the orange grove property for one

Captain Bryant, and Jones said he had just sold it to Tate for $500; Jones permitted Tate to move on before the trade was made; the purchase spoken of was before Tate built his house there, and Tate continued to occupy the premises, and sold oranges from the place that year and up to this date, (1868); Tate lived there in the fall of 1862; commenced improving the place after he bought it, setting out trees and pruning those already there; the place is worth about $2000, (1868); Jones got the first crop after Tate went there, and afterwards Tate had them; Tate built a common log house and enclosed five acres; I carried lumber there for Tate, and also 200 bushels of corn.

John Jones says he heard Jones say, sometime in June, he had sold *both* places, Jack's Hammock and the mill place, to Tate, and had been paid for both places; that he was old and was not able to take care of them.

Nathan J. Rhames says Tate had about eight acres under enclosure; the houses were small log houses.

Mary Lee (daughter of Tate) says when father came home and said he had bought the place, he commenced manuring and setting out trees; the place is worth (1868) $2000; Jones' lumber was hauled off the place, in 1863; Mr. Jones told father to go to the place and take care of it before father bought it; about two acres were then under cultivation.

Seaborn Tate says Jeremiah Tate made improvements on the "old mill" place while he lived there, from 1863 to 1866, cleared the orange grove, made fences, planted out trees and divided some trees; it is valuable only on account of the orange grove; some lumber was hauled away in 1863; Tate was put in possession by Jones to take care of it, about two acres then under cultivation; Tate built no houses or fences except for his own benefit.

Robert J. Taylor says he heard Jones say at the blacksmith's shop he had sold Tate an orange grove, and had got

$500, for it; don't know what place he spoke of; Tate was living on the "old mill place" in 1863, on the west side of the Chipola river; the place is valuable on account of the orange trees on it, and without the grove it is worth very little.

Rolly Richards says he estimates the value of the "old mill place" at $2,500; Tate's improvements were in setting out trees, fencing, and building a dwelling-house; in spring of 1868 I held possession of the place for Tate; went away leaving a gun there, and nailed up the door; told L. Whitfield when I went away I was going across the lake but would attend to the place; am told that Redd and Rhames now occupy it, (1868).

James Register says he heard Jones say in 1863 he had sold his orange grove on the west side of the lakes to Tate, and Tate had paid him $500 for it that day, and could not make the title as he was then sick; Mrs. Shaw was there about the house; don't think she was present at this conversation.

Alexander Hawkins says there were 50,000 oranges raised there in 1866, worth three to four cents each in the orchard; saw some lumber there, and the grove looked like it was well cared for; the place is worth (1868) $1,500; the trees in 1866 were in better condition than when Tate went there, and the place is worth more.

*For the Defence.*—Wm. A. Whitfield testifies that he was present in June, 1863, when Jeremiah Tate made a trade with R. S. Jones for an orange grove in Calhoun county, at Jones' house; saw $200 paid by Tate to Jones for an orange grove, the place where I was living at the time; it was the place called "Jack's Hammock," in the forks of the rivers; Tate was not living there at the time, but moved to it as soon as I moved out; I had bought it of Jones, and had not paid for it; the money paid by Tate was $200, in bills of the State Bank of Florida; Jones immediately went out

into the other room with the money in his hand, and called for the bureau key; if Mrs. Shaw saw the money it was then, before he locked it up, as she did not see it when it was paid; Tate was not living on either place at this time; there was no lumber on the place he bought; never heard Tate claimed to have bought the place on the west side of the Chipola until after Jones' death; the place on the west side is worth (1868) $600; Tate took possession of the "Jack's Hammock" place on the first of December, 1861; there was about eighteen acres of it; Tate did not make any valuable improvements on the place on the west side of the river, not enough to pay the rent.

William Redd says heard Jones speak of having sold Tate the orange grove in the forks of the Apalachicola and Chipola rivers; the "old mill place," on the west side, is now (1868) worth about $300, with the orange trees on it; Mrs. Shaw was living at Jones' while I was there, and quit before I did; she was not there when the pretended sale claimed by Tate was made for the old mill place orange grove.

Robert L. Whitfield says I put Tate into possession of the orange grove on the west side of the river until he could build upon his own place near the orange grove, and to take care of the grove; it was in better condition when he went there than in 1866; the improvements that had been made were worth about $300; Mrs. Shaw was not at Jones' at the time of the pretended sale of the orange grove on west side to Tate, but was there at the time of the sale of the orange grove between the rivers; oranges were worth in 1863 to 1866, 5 to 6 cents each; about 50 to 60 thousand were produced then on the west side grove annually; Tate said if I would let him go on the place he would pen his cattle there and take care of it and keep it in repair; the place was worth $800 when he went on it, and is not worth more than $200 now (1868); it had decreased in value.

Joseph Willis says the place was in a bad state when Tate went on it; one house, one old crib, and old smoke-house—all log houses; in May, 1866, it was in about the same condition as when he went in; don't think there were any more trees than when he went in; the trees were in better condition than when he went in.

Stephen Page, Wm. Redd and Levi Rhames testify that the buildings on the place were of little value; that Tate made little or no improvements on it, injured the trees, set out very few, if any, new trees. Page thinks the place worth $300 when Tate took possession, and now (1868) $250. Nathan J. Rhames says he is now occupying the place; went in in March, 1868, at the request of R. L. Whitfield, and holds it for the Jones estate; no one was there when he went in; the house was open and the place abandoned, fences down, nothing in the houses; Tate lived fifty miles away and Richards five miles.

There was much more testimony in the record relating to the manner in which the premises had been treated, cultivated, improved or depreciated, of the same general character, which it is not deemed necessary to read, as it does not affect the judgment of this court. Indeed, from the manner of taking the testimony, much of it is not very intelligible.

It was insisted in the argument of the case that the proof of the agreement was not satisfactory, because the testimony of the plaintiff's witnesses was contradicted, and because it was not direct and reliable. We think it is shown that an agreement was entered into as set out in the complaint. The answer of Mrs. Jones admits that a negotiation relating to this property was going on between her husband, Robert S. Jones, and Jeremiah Tate, some time before Jones' death, which occurred in December, 1863. Mrs. Shaw testifies that she was present when a trade was made, and saw the money paid, and Jones said it was five hundred dollars for the orange grove where Tate lived, (being the property de-

scribed in the pleadings.) This occurred in June, 1863.. Duncan Shaw, Samuel Davis, John Jones, R. J. Taylor and James Register, all swear that about the time named, (and one or two of them on the same day on which the agreement is alleged to have been made,) they had conversations with Jones in which he said he had sold the property to Tate, and had been paid for it. Mrs. Shaw says Jones wanted to sell to Tate some lumber on the place, and that Tate declined to purchase it. Mary Lee and John Jones say the lumber was hauled away during that summer from the place Jones sold to Tate; and the proof further shows that Tate procured other lumber to be brought there for building purposes, and that he built a house there.

This testimony shows the agreement, the terms, the identity of the property, the price paid, and two or three of the witnesses say that Jones gave as a reason why the title was not made at the time was that he was sick. This was in June, and Jones died in December. Against this is the testimony of Wm. A. Whitfield, who says that about June, 1863, he was present when Jones sold to Tate an entirely different property on the other side of the river; that the price paid by Tate for it was $200 in notes of the State Bank of Florida; that it was a place where he (Whitfield) lived, and that Tate took possession of it the same year when he moved away from it; that Mrs. Shaw was present at Jones' house, but did not hear the bargain, nor see the money paid; that Tate was not living on either place at the time; there was no lumber on the place so sold; and finally winds up by stating that this transaction was in 1861, instead of 1863. The effort of this witness seems to be to show that Mrs. Shaw was mistaken as to the time and subject-matter of the bargain. If anything further was necessary to dispose of this testimony, it may be found in a stipulation on file in this record, signed by the respective counsel, that the payment was made, if at all, in Confeder-

ate States notes, while this witness says the payment was made in the notes of a particular description of the State Bank of Florida, which were counted out by the witness at the time. The only solution of this may be found in the testimony of one or two of the witnesses, who state that Jones said he had sold to Tate *both* orange groves, and had been paid for both.

The testimony of Mrs. Shaw is also said to be shaken by that of R. L. Whitfield and William Redd, who both state that " at the time of the pretended sale" of the " old mill place" by Jones, as claimed by Tate, Mrs. Shaw was not there, as she had stated. They do not show where she was. (It may be thought that this is an attempt to show that a circumstance stated by her did *not* occur at all, and that she was not present when it *did* occur.) James Register says, however, that Mrs. Shaw was at Jones' house in 1863 on the day that Jones said he had sold his orange grove on the west side of the river to Tate, and had been paid $500 for it *on that day.* Indeed the only serious attempt at contradiction is aimed at the testimony of Mrs. Shaw, and the attempt scarcely raises an issue of veracity between the witnesses; but if such issue is raised, we find her sustained so fully and plainly by several others as to collateral facts, as to the time and terms of the agreement, the payment, the amount paid, the property bargained for, and the title to be made, that there can be no doubt of her entire truthfulness.

The agreement is, therefore, found to be fully and satisfactorily proved as alleged, and the payment of the purchase-money is proved beyond question, not only by the direct testimony of Mrs. Shaw, but by the direct declarations of Jones to several witnesses.

Next as to the possession. It appears that Tate was in possession of the premises as a tenant, or by the permission of Jones, at the time the agreement was made. R. L. Whitfield says he put Tate into possession of the orange grove

"to take care of the place until he could build upon his own place near there." "Tate said he would pen his cattle there, and take care of it and keep it in repair." This was in 1862. It appears that immediately after the time of the contract, in June, 1863, Tate commenced to treat the place as one would naturally do with his own property. The lumber belonging to Jones was carried away by his servants, though it was of very little value. Tate brought lumber and materials and proceeded to build a house, not on "his own place near there," but upon the orange grove premises. That it was a log-house, and not a large or expensive one, is of little consequence. He commenced to set out trees; to divide old trees and reset them, and to trim and prune them; and some were injured by too much pruning, as the witnesses think. It does not appear that he improved "his own place near there" after that time. Prior to the making of the agreement, the crop of oranges was had by Jones, and after the agreement the crop and the proceeds were had by Tate, and it does not appear that Jones or his widow and heirs made any claim to the crop or to the property until after the present litigation commenced in 1866. Tate remained there with his family, instead of going to live, as he had contemplated, upon "his property" near it, and no complaint appears to have been made by Jones or his family of the manner in which the place was conducted by Tate. Everything that Tate did after the agreement seems to have been with reference to proprietary rights. The erection of a dwelling-house, the enlarging of the enclosures by fences, and of the quantity of land cultivated, and establishing his domicil with his family there for years, is not consistent with the idea that he was a mere tenant at will, "taking care of the place until he could build on his place near." It cannot therefore be assumed upon all these facts that he was merely "continuing the possession" as the tenant of Jones. It is claimed that he abandoned the possession of

the place, and the evidence shows that he did leave with his family in 1868, two years after this suit was commenced; but it is shown that he left a tenant in charge of it, and that during the temporary absence of the tenant some of the defendants entered and took possession without his consent, and have continued such possession pending this litigation. There is nothing in the circumstances of Tate's leaving the premises in this manner which tends to weaken the claim set up by him as a purchaser in 1863.

As to the value of the improvements there is no precise rule, and none can be established, by which a certain amount of money must be expended in order to establish a right.   It has been said that if the improvements are "valuable," and are made in pursuance of the agreement, and are referable to it, this will take the case out of the statute; or if possession has been delivered and acquiesced in by the other party, in pursuance of the agreement, this takes the case out of the statute, (Purcell vs. Miner, 4 Wallace,) and there is a case for a specific execution.   The witnesses for the defence pretty generally agree that the property in question is of very little value, and depreciated much while Tate was in possession, from June, 1863, to May, 1866, its value being fixed by them at $200 to $600 in 1868, while at the same time some of them say the place produced fifty to sixty thousand oranges annually, worth 3 to 6 cents each. The witnesses for the plaintiff agree (as to the productiveness of the orchard) with the witnesses on the other side, while they estimate the value of the property in 1868 at $2,000 to $2,500.

The testimony of the witnesses as to the improvements varies in about the same ratio.   Some of them say that some seventy-five trees were put out, and the orchard kept in good condition by Tate, while others say there are but two or three trees set out by Tate, and the rest of the grove nearly ruined by his bad treatment.   The plaintiff's witnesses say

Tate v. Jones—Opinion of Court.

that Tate built a dwelling-house and out-buildings, while the defendants' witnesses say that there were no buildings of any great value erected, the houses having been built of logs. There is no rule that houses or other improvements should be built of wood or stone, hewed or sawed, worth $100 or $10,000; the question is whether the price being paid and possession being given or retained under the agreement to sell and convey, the fact of the improvements being made and the character or value of them are such as to show that they are consistent with the theory that what has been done has been done with reference to the agreement, and inconsistent with any other legitimate presumption.

The testimony of the witnesses on the part of the defence, as to the value of the property, as we have seen, is somewhat extraordinary. Notwithstanding their statements that Tate's method of treatment of the orange trees which they say has depreciated the value of the place so that at the time they were testifying (in 1868) it was worth only from $200 to $600, yet they prove that some years after 1863 it produced fifty to sixty thousand oranges annually, worth 3 to 5 cents each, or upwards of $2,000 per annum; while Jones sold it for $500 in the prevailing currency in 1863. Either these witnesses are mistaken in regard to the proper treatment of the property by Tate, or they are mistaken in their judgment of the value. Our conclusion is from all the evidence as to the possession and the improvements made by Tate after the alleged agreement, that notwithstanding he was a tenant of Jones in the first instance, yet the character of the possession after June, 1863, and the acquiescence of Jones and his heirs and representatives since that time, were inconsistent with the terms of that tenancy, and were consistent with and are deemed to be evidence in support of the alleged agreement to convey to Tate.

This is consistent with the rule of equity in cases of this character as administered in this country in all the States,

except two or three in which no exceptions to the statute are allowed. (See 1 Story's Eq. Jur., §§759 to 770, 11th edition, and the English and American cases cited on this subject.)

The decree of the Circuit Court is affirmed with costs.

The appellants filed the following petition for a re-hearing:

*To Hon. Edwin M. Randall, Chief Justice, R. B. Van Valkenburgh and James D. Westcott, Jr., Justices of the Supreme Court of Florida:*

The petition of appellants in case of Jones' executor vs. Tate's administrator, respectfully shows that they are advised that there is error in the judgment of this court affirming the judgment of the Circuit Court of Jackson county in this—

1. That there is no sufficient proof made by the appellee of part-performance of the alleged contract of sale of the lands described in bill of complaint as will dispense with the requirement of the Statute of Frauds that such contract should be in writing.

2. That the testimony relied on to establish the verbal contract itself is contradictory and conflicting, and is not "full, satisfactory and indubitable."

3. That the testimony relied on is hearsay, and declarations of one party or the other to strangers to the transaction, which, it is insisted, is not the character of proof required in such cases.

4 That it is not sufficient that the verbal contract be sustained by proof that inclines the mind to its belief, but it should be sustained beyond a reasonable doubt, such as is required in criminal cases to convict.

5. That the same character and degree of proof is required to establish the facts relied on to take a case out of the operation of the Statute of Frauds, to-wit: of *payment, delivery*

of *possession*, *valuable improvements*, &c., as is required to establish the contract itself; and appellants allege that the proof, particularly of possession, and improvements referable to the alleged purchase, are too vague, contradictory, and unsatisfactory to bring the case within the exceptions to the statute.

6. Admitting that there was a verbal contract of sale by Jones to Tate, and payment of $500 Confederate money, appellants claim that a *locus pœnitentiœ* existed in which Jones had a right to return the money and repudiate the purchase, and in which Tate had the corresponding right to sue for and recover the purchase-money; and a sufficient reason is found for the non-exercise of this right on the part of Jones in his condition of health at the time of the alleged sale, and his early death thereafter. A sufficient explanation of the non-action of the representatives and heirs of Jones, in dispossessing Tate of the premises, is furnished by the existence of war in the country from the death of Jones to the spring of 1865. *Inter arma silent leges.* The confusion and disorganized condition of the country, and its tribunals, immediately on the close of the war, and the expectation that it is fair to assume the parties indulged, that all the rights of the parties would be fully and promptly adjudicated and settled by the decree of the court in this case, which was instituted the — day of ——, A. D. 1866.

7. That the court erred in assuming acquiescence on the part of Jones in his life-time, or his representatives after his death, in the alleged acts of ownership of Tate over the lands, inconsistent with his rights of occupancy, without proof of the knowledge by Jones, in his life-time, of such acts, and after his death and before the institution of this suit, in 1866, by his representatives. The record (we have not access to the record, and this we state from memory,) contains no proof of any claim of ownership by Tate prior to the institution of this suit, and of course no knowledge of

such claim can be imputed to Jones' representatives, appellants insisting, as they have always done, that his improvements were of small value, and for his own convenience as tenant at will and entirely consistent with his tenancy. "He was to take care of the place and pen his stock on it." The record contains evidence of the assertion of ownership by Jones on his death-bed. (Testimony of Yon.) This is strongly corroborative of the ignorance of Jones of any claim of ownership by Tate, and disproves the alleged acquiescence of Jones.

8. That the court erred in discarding the *value* of the improvements made as an element in determining whether they were made with reference to the parol contract of sale, because a party is not apt to make large expenditures on property that he holds as tenant at will, and where the improvements are only of small value, they are consistent with such tenancy, and are not necessarily referable to a purchase of the property, which appellants are advised the rule requires.

For these reasons, and that justice may be done between the parties, your petitioners pray the said cause may be reheard by this honorable court.

And as in duty bound your petitioners will ever pray, &c.

C. C. YONGE,

J. F. McCLELLAN,

*Solicitors for Petitioners.*

The following opinion, denying the petition for a re-hearing, was delivered by THE CHIEF JUSTICE:

The petition in this case for a re-hearing is considered without reference to the question of regularity as to the time of filing it, and without admitting that it is strictly brought within the rules.

The petition is substantially a repetition of the grounds

relied upon in the petition of appeal. Every point made is fully treated of in the opinion delivered at the last term. The record of the case is somewhat voluminous, and it was no small task in the examination of it to ascertain precisely what the proof was upon many points; but the necessary labor was bestowed upon it to satisfy the court that we had possessed ourselves of every fact essential to an intelligent understanding.

Upon reviewing the record and the opinion filed, aided by the suggestions in the petition, we are unable to arrive at a conclusion upon the facts or the law of the case other than that found in the opinion. We think nothing was "assumed" by this court in regard to the facts beyond what seemed to us clearly established by the proofs in the case. The resume of the evidence contained in the body of the opinion embraces every material fact bearing upon the merits, so far as we could discover the facts from the record, and upon a careful re-examination we do not find ourselves called upon to add to or take from the statement there made. The testimony in regard to the assertion of ownership by Jones, after the time of the alleged agreement, in the absence of Tate, if it clearly referred to the premises in question, was of no more importance than the proof of the declarations of Tate, both of which were rejected as not being legitimate evidence.

The petition for a re-hearing is denied.